No. 589             July 1, 2026             1

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of B. A. R.,
a Youth.

STATE OF OREGON,
*Respondent,*

*v.*

B. A. R.,
*Appellant.*

Crook County Circuit Court
24JU01658; A185265

Wade L. Whiting, Judge.

Argued and submitted March 11, 2026.

Stacy Du Clos, Deputy Public Defender, argued the cause for appellant. Also on the brief was Shannon Storey, Chief Defender, Juvenile Appellate Section, Oregon Public Defense Commission.

Joanna Hershey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Interim Deputy Attorney General.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

ORTEGA, P. J.

Reversed.

**ORTEGA, P. J.**

In this juvenile delinquency case, youth appeals the juvenile court's judgment declaring her to be within its jurisdiction for acts that would constitute coercion, ORS 163.275, and initiating a false report, ORS 162.375, if committed by an adult. The underlying facts involved a nonconsensual sexual encounter between youth and a peer, P. In five assignments of error, youth contends that the state presented insufficient evidence on both counts and, alternatively, asserts that the trial court applied an incorrect legal standard to conclude that youth need only act with criminal negligence with respect to the risk that a false report will be transmitted to law enforcement. The latter argument is unpreserved and, in any event, we do not reach it. Viewing the evidence in the light most favorable to the state, we conclude that the record is insufficient to find youth within the court's jurisdiction. Accordingly, we reverse.

## I.   FACTUAL BACKGROUND

We set forth the sensitive facts in this case—which likely would have benefited from attention much different than can be found in any juvenile delinquency proceeding—in the light most favorable to the state. *State v. B. I. Z. V.*, 332 Or App 726, 732, 550 P3d 985 (2024).

### A.   *Youth's Interaction with P and D*

Youth, then age 15, had been dating 16-year-old P for about three weeks. On the day of the sexual encounter at issue, the two met at school and walked back to P's house to do homework and watch a movie. P testified that, eventually, they went to his bedroom, laid down on his bed, and began kissing, at youth's initiation. P began touching youth's stomach and thighs and, several minutes after youth had stopped touching or responding to him, P touched youth underneath her underwear and inserted the tip of his finger into her vagina. By that point, P had observed that youth was looking at her phone but did not answer phone calls from her mother or her aunt. He testified that he "asked her multiple questions asking if this was all right and she wouldn't answer." After about 10 minutes of P making intimate contact to which youth was not responding, P

eventually stopped touching her upon noticing that she was communicating with someone on Snapchat.

While not responding to P, youth was sending Snapchat messages to D, another boy from her school. Youth only knew D through Snapchat; D did not know youth's last name or what she looked like at the time of their Snapchat encounter. Youth sent D a photo of a ceiling, followed by a text indicating that an unnamed person "took me back to his house and he's forcing me to have sex." D, understandably concerned, told youth to try to escape and come to him. She told D that the person would not let her leave and reported that she was hurting and bleeding a lot, that she had cramps, and that the person was making her uncomfortable. D urged youth to send him an address or share her location and suggested that she take a photo to show to the police later. Although D asked for a location and P's name, youth did not offer either one, though she did ask D to "please help." He testified that he told her he would get the police involved but she told him not to "because she didn't want me to get in trouble."

D showed a school administrator the messages, and the administrator contacted the school's resource officer, Coffman, who then notified his sergeant, Vollmer. They interviewed youth that same day, as we describe below. The next day, after police had contacted youth, she messaged D and asked, "You called the cops?" D believed that youth was disappointed that he got the police involved. Youth had not asked D to call the police and never referenced enlisting help from anyone else.

B.  *Youth's Account to Police*

Vollmer and Coffman, after discerning youth's identity with the help of school administrators, spoke with youth's mother and then called youth, who was still at P's house. She agreed to meet with them near a market on the side of a busy road down the street from P's house. Youth told the officers that she had walked with P to his house to do schoolwork, that they studied for a while, then began watching a movie and, a half hour into the movie, P began trying to take her pants off, which made her feel uncomfortable. She stated that P was lying on top of her and touching her. When asked if she told P

that she was uncomfortable, youth stated that she always had a difficult time expressing her feelings and that she tends to "go silent." She stated that when P tried inserting the tip of his finger into her vagina, she grabbed his hand, and he said "sorry." Youth stated that P continued to lay on her while they watched the movie. She told officers a few different reasons why the encounter ceased. P testified that he stopped because she was not responding to him and was on her phone, whereas youth stated in her interview that the encounter ceased either when she got a message from her mom, or when P got a message from his mom that she was on her way home.

Coffman attempted to clarify youth's use of the word "force" to describe P's conduct. Youth explained that she tried moving her leg to indicate that she felt uncomfortable and that P, with his hand on her thigh, kept opening her legs. She stated that she sat up at one point, thinking he would understand that she was not interested in any sexual contact, but once she laid back down, he continued to try to touch her. Vollmer then questioned youth about whether she and P had discussed having sex before the encounter. She said they had discussed it the night before, but once he began touching her, she felt very uncomfortable.

Neither Coffman nor Vollmer ever interviewed P about the sexual encounter. Detective Adkins interviewed P after his mother contacted the police department about messages youth had sent P over various social media platforms. Adkins and P both testified that P did not initially admit to the full extent of his sexual contact with youth because he was nervous that he would be in trouble.

C.   *Youth's Continued Communication with P*

Youth continued texting with P that evening. When he saw (via location sharing) that she was at the hospital, P asked her why, and she told him that she was getting a rape kit done. He did not ask any further questions at that point, but after rumors started circulating at school, P messaged youth asking her why she was accusing him of sexual assault. She denied making that accusation and told P that she was not trying to get him sent to jail. In response to his pleas for her to communicate better with

him, youth responded that she "was scared like I feel like u don't understand my body language or me in general [right now]." P testified that youth told him, "I haven't been going around saying you raped me or sexually assaulted me. You didn't do anything like that to me at all." P recounted that youth blamed D for their problems and that she wanted to kill herself. He explained that he initially stayed in contact with youth in order to resolve any issues between them and because he was worried for her safety.

Eventually, though, P blocked youth on Snapchat and Discord a couple days after their sexual encounter. A day or two after he blocked her, youth sent P messages on Facebook messenger:

"I can't believe u did what u did

"like honestly

"what u fucking did and what ur doing right now is complete fucking bullshit

"I am getting outta every class I have with u bcs of what u just did

"If u wanna act like this then I will make problems happen at school

"cuz as of [right now] I am so fucking tempted to jus post all over my fb story about what happened between us then tell everyone that u jus up and blocked me after u touched me inappropriately

"I am opening another case

"u are gonna regret every single thing that happened between us and ur gonna regret blocking me too

"so jus wait and you will see what happens."

P testified that he shared the Facebook messages and the previous messages with Adkins, and ceased all contact with youth at that point.

D.  *Procedural History*

The state ultimately sought juvenile court jurisdiction over youth, based on allegations that her actions, if committed by an adult, would constitute coercion, ORS

163.275 (Count 1), and initiating a false report, ORS 162.375 (Count 2). Youth moved for a judgment of acquittal (MJOA) on both counts. For Count 1, coercion, youth argued that the state presented no evidence that she threatened to make false allegations. For Count 2, initiating a false report, youth argued that (1) a 15-year-old would not know that her message would be treated as a report that would be transmitted to authorities, and (2) there was insufficient evidence that the report was false because she was sharing her perception of the encounter.

The state pointed to youth's message to P stating that she did not accuse him of sexual assault as her admission that the allegations of sexual assault were false. The state asked the juvenile court to infer from that statement that any additional case that she would open, as she threatened to do, would be false and would therefore satisfy that element of coercion. The juvenile court denied youth's motion as to Count 1 and, relying on *State v. J. L. S.*, 268 Or App 829, 835-36, 343 P3d 670 (2015), also denied the motion as to Count 2.

The trial court made extensive findings as part of its speaking verdict. In describing the nature of the encounter between youth and P, the court found:

> "From my perspective as a judge, when that direct question [as to whether the person is comfortable with the touching that is happening] is asked and no response is given, non-response is not consent.

> "There's also a statement from [P], 'She was texting while I was touching her vagina.' Clearly something was going on. [Youth] wasn't fully invested in the sexual contact.

> "So I understand based on the relationship status and prior discussion of a sexual relationship why [P] was attempting to progress the sexual relationship in the bedroom that day. I also understand why a 15-year-old girl may have been uncomfortable, wanted to slow things down, may not have spoken up and explicitly said no. Both can be true."

Despite that finding, which we read as recognition that the sexual encounter was not consensual, the court also found that the Snapchat messages that youth sent to D amounted to a false report. The court specifically found that youth's

statement that P would not let her leave made it sound like she was "being essentially held hostage." Further, the juvenile court noted that some of youth's messages referencing bleeding and hurting would suggest that the encounter was more forcible than it was. The court also relied on and adopted the inference urged by the state that youth did not give D a name or location because she knew that what she was saying was false.

As to the initiation of a report, the court reasoned that, given the nature of the messages, it was "foreseeable that somebody would then transmit that to the police because of just the sheer shocking aspect of the statements, severe sexual assault, being held against her will." Based on those findings, the court found youth to be within its jurisdiction on Count 2, initiating a false report.

On Count 1, coercion, the court concluded that youth induced P not to block her when he had the right to refrain from communication with youth. The court further concluded that she threatened to make false accusations, reasoning that, "having previously found that it was a false report, despite sexual contact happening, *** her threatening that she was [going to] open another case with all the other threats that are included ***, I'll find *** youth in jurisdiction of the court for Count 1, coercion, as well."

Youth appealed, challenging the trial court's denial of her MJOA as to both counts.

## II.  ANALYSIS

We review the juvenile court's legal conclusions for errors of law and review the record in the light most favorable to the state to determine whether a rational factfinder could have found the essential elements of the alleged acts beyond a reasonable doubt. *B. I. Z. V.*, 332 Or App at 732-33.

A.  *Coercion*

We first address whether the state provided sufficient evidence for a rational factfinder to find the essential elements of coercion beyond a reasonable doubt. ORS 163.275(1)(e) provides:

"(1)   A person commits the crime of coercion when the person compels or induces another person to engage in conduct from which the other person has a legal right to abstain *** by means of instilling in the other person a fear that, if the other person refrains from that conduct compelled or induced ***, the actor or another will:

"*****

"(e)   Falsely accuse some person of a crime or cause criminal charges to be instituted against the person."

Youth advances three distinct arguments on appeal, only one of which is preserved, so we focus our analysis on that argument. Youth contends that the state did not present sufficient evidence that she threatened to falsely accuse P of a crime or cause criminal charges to be instituted against him. We agree.

Coercion requires the state to prove three distinct elements: "(1) that [the] defendant compelled [the victim] to do something; (2) that [the victim] had a right not to do; (3) by making [the victim] afraid that if [he] did not do it, one of the statutorily enumerated consequences would result." *State v. Powe*, 314 Or App 726, 732-33, 497 P3d 793 (2021). Youth challenges the sufficiency of the evidence as to the third element. We conclude that the record is insufficient for a rational factfinder to conclude that youth would falsely accuse or cause criminal charges to be instituted against P. While youth did threaten P by saying that she would "open another case"; the record does not support an inference that, if youth went to the police, she would falsely accuse P of something that did not happen. The record reflects, and the trial court expressly acknowledged, that P had nonconsensual sexual contact with youth. Youth's account of that nonconsensual sexual encounter to the police was consistent with P's own account of the encounter, notwithstanding disagreements about why or when the encounter ended and how much clothing she had on. It was impermissible to infer that youth would assert to police the exaggerated accusations in her Snapchat messages to D, messages that she did not know would be transmitted to police at the time she sent them, when the record already reflects that she did not lie to the police about the potential criminal conduct. Thus,

we reverse the court's finding of jurisdiction as to Count 1, coercion.

B.   *Initiating a False Report*

Next, we consider whether the state presented sufficient evidence for a rational factfinder to find the essential elements of initiating a false report. ORS 162.375(1) provides:

> "A person commits the crime of initiating a false report if the person knowingly initiates a false alarm or report that is transmitted to a fire department, law enforcement agency or other organization that deals with emergencies involving danger to life or property."

A person "initiates a false alarm or report" "if the person's communication 'begins' or 'marks the beginning of' informing the organization about the circumstances that are the subject of the report." *State v. Branch*, 362 Or 351, 362, 408 P3d 1035 (2018) (brackets omitted). In this context, the state must prove that youth knowingly communicated in a way that began or marked the beginning of informing law enforcement about the circumstances.

In finding that youth's actions constituted initiating a false report, the juvenile court relied on *J. L. S.* However, that case specifically declined to hold that a person violates the statute by making a report to a third person who then transmits that report to the police. 268 Or App at 836-37, 837 n 2 (holding that the youth violated the statute when he continued to lie to the detective who responded to his father's 9-1-1 call, which triggered action by the Major Crimes Unit as a result of the youth's continued lie, and thus, that the court "need not decide and do[es] not decide whether youth violated the statute by 'going to [his f]ather'"). Therefore, it remains an open question whether a person initiates a false alarm or report by making statements to a third party that do not request the involvement of law enforcement.

*State v. Morales*, 307 Or App 280, 288-89, 476 P3d 965 (2020), is instructive on that question. In that case, the defendant told his mother that he had been struck by a vehicle in the parking lot of a grocery store. *Id.* at 282. His mother then called the police on his behalf, and when the

police arrived, the defendant continued to lie to the police and was arrested for initiating a false report. *Id.* At trial, the court offered the following instruction: "'A person commits the crime of or the offense of initiating a false report if the person initiates or sets going a report to a law enforcement agency, knowing that such information is false. *Persons can act in concert to initiate a false report.*'" *Id.* at 284 (emphasis in original). We concluded that the court erred in offering that instruction, providing the following reasoning:

> "In view of the explanation in *Branch* of the type of conduct necessary to support a conviction under ORS 162.375(1), the trial court's instruction that '[p]ersons can act in concert to initiate a false report' was misleading. That is because the instruction suggested to the jury that it could find defendant guilty even if, as required under *Branch*, defendant did not knowingly engage in conduct that 'mark[ed] the beginning' of a false report to law enforcement, based on defendant's conduct of telling his mother (who was not law enforcement herself) about the alleged collision, and his later conduct in responding to the police questioning triggered by his mother's 9-1-1 call. Said another way, the instruction, by suggesting to the jury that it could rely on the conduct of another to convict defendant without elaborating further on how, precisely, another's behavior could be taken into account, created the risk that the jury would find defendant guilty without finding that he, himself, engaged in the conduct proscribed by the statute with the requisite mental state."

*Id.* at 288-89.

Following our reasoning in *Morales* and *J. L. S.* and the rule set forth in *Branch*, we conclude that the state must prove that a person knowingly communicates to inform the organization about the circumstances that are subject of the report. A person acts "knowingly" if they act "with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists." ORS 161.085(8) (defining what it means to act "knowingly"). Thus, the state was tasked with showing that youth acted with an awareness that her conduct began or marked the beginning of informing law enforcement.

Here, the evidence does not allow for a reasonable inference that youth acted with such awareness. Youth sent

ephemeral messages over Snapchat to a boy whom she had never met in person, who did not know her last name, and who did not know her location or who she was accusing. While she asked D to "please help," it was unreasonable to infer that she acted with an awareness that D would find a way to inform police about the circumstances without her asking him to (indeed, with her asking him not to do so), or at the very least, without providing identifiable information. Indeed, involving law enforcement required D to consult a school administrator, the school administrator to inform the resource officer, and after discerning youth's identity, to inform the officer's sergeant. Youth did not report the same information when contacted by police, and the next day, according to D, youth was surprised and disappointed that he got the police involved. While the record does support a finding that, in communicating with D, youth exaggerated her circumstances to the point of falsehood, it does not support the inference that a 15-year-old girl, in the midst of a nonconsensual sexual encounter, knowingly communicated through Snapchat messages to a teenage acquaintance with an awareness that her communication would begin a process of informing law enforcement. *Compare State v. L. J. G.*, 339 Or App 681, 683, 568 P3d 1032 (2025) ("Although the evidence would support a finding that youth's conduct caused 'substantial inconvenience' \*\*\*, it does not support a finding that causing substantial inconvenience was youth's conscious intention when he pushed and pulled on the ceiling tile \*\*\*. On the contrary, the only reasonable inference on this record is that youth gave no thought as to how his efforts to explore the hole in the ceiling might inconvenience the school or others."). Thus, the court erred in finding her within its jurisdiction as to Count 2, initiating a false report.

Reversed.